**DILKS v. UNITED STATES.**
No. 48042.

United States Court of Claims.
Nov. 28, 1950.

Fred W. Shields, Washington, D. C., King & King, Washington, D. C., on the brief, for plaintiff.

Paris T. Houston, Washington, D. C., H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

LITTLETON, Judge.

Plaintiff, a United States Army sergeant, who was captured by the Japanese while assigned to temporary duty on Wake Island under orders providing for the payment of allowances for quarters and subsistence, sues for such allowances covering the period he was held as a prisoner of war by the Japanese. Plaintiff contends that he is entitled to such allowances by virtue of Section 2 of the Missing Persons Act of March 7, 1942, 56 Stat. 143, as amended by the Act of July 1, 1944, 58 Stat. 679, 680, 50 U.S.C.A.Appendix, § 1002. Defendant contends that the statute read in the light of certain legislative history and consistent administrative practice denying claims such as plaintiff's, does not authorize the payment of the claim.

On October 31, 1941, plaintiff and others stationed at Hickam Field, Honolulu, Territory of Hawaii, were ordered (finding 1) to temporary duty at Wake Island. The orders stated that since it was impracticable for the Government to furnish rations in kind, or cooking facilities for rations, the enlisted men would be paid a certain monetary allowance while on such duty. The amount of such allowance and the applicable regulations were incorrectly cited in the order, but plaintiff concedes that if he is to recover, it shall be at the rates set forth in the applicable regulations. At the time plaintiff's orders were issued, the correct regulations (Cir. 50, dated March 26, 1941, amending AR 35—4520, Dec. 21, 1940, and set forth in pertinent part in finding 7)

provided that men traveling on duty where cooked or travel rations were not furnished should receive daily allowances as follows: $2.25 per day for rations and $1.50 per day for quarters from the time of departure, through the first three days of detention; $1.65 per day for rations and $1.35 per day for quarters from the fourth to the sixth day of detention; $1.40 per day for rations and $1.15 per day for quarters from the seventh to the thirty-first day of detention; for any period of detention in excess of thirty-one days at the same place, the circular provided that the allowances in Table I would govern. Table I was applicable to men on permanent duty where quarters or rations in kind were not furnished, and provided for the payment of $1.20 for subsistence and $1.15 for quarters. Subsequent Executive Orders were issued during plaintiff's captivity which made slight increases in the subsistence and quarters allowances provided for in Table I. The periods covered by the Executive Orders and the subsistence and quarters allowances provided for in each are set forth in finding 8.

Plaintiff left Hawaii on November 1, 1941, and arrived on Wake Island November 11, 1941, where he remained until December 23, 1941, on which date he was captured by the Japanese and held prisoner until his release on August 15, 1945. During his captivity, plaintiff was not furnished quarters or subsistence by the United States Government but was furnished subsistence and quarters by the Japanese. He was required by the Japanese to work as a motorcycle mechanic and received therefor 15 sen a day. At that time the sen was equal to one American penny.

Plaintiff has been paid a per diem allowance of $2.50 for rations and $1.50 for quarters for the time he was on Wake Island until December 23, 1941, the date of his capture. On March 20, 1947, plaintiff made a claim on defendant for the per diem allowance as specified in his orders for the period of his captivity This claim was denied on the ground that the Missing Persons Act and the regulations issued thereunder did not require the payment of such per diem during the period of imprisonment.

Section 2 of the Missing Persons Act reads in part as follows: "Any person who is in active service and who is officially determined to be absent in a status of missing, missing in action, interned in a neutral country, captured by an enemy, beleaguered or besieged shall, for the period he is officially carried or determined to be in any such status, be entitled to receive or to have credited to his account the same pay and allowances to which he was entitled at the beginning of such period of absence or may become entitled thereafter * * *."

This language was contained in the Act of March 7, 1942, and was not changed in the amendment to the Act passed on July 1, 1944. From the plain wording of the above section there would seem to be no reason to deny plaintiff's claim since at the beginning of his capture he was clearly entitled to $1.20 for subsistence and $1.15 for quarters.[1] Plaintiff contends that administrative interpretations of the Army and Navy Departments to the effect that such temporary allowances may not be credited to the account of a captured soldier during the period of his captivity nullify the clear provisions of the statute. Defendant, however, argues that these interpretations were not unreasonable and did not nullify the statute but merely placed on it the interpretation intended by Congress, as reflected by the Report of the Committee on Naval Affairs of the House of Representatives concerning an amendment to the Missing Persons Act, and by a statement made before the Committee by a member of the Army-Navy-Marine Board for the Administration of the Missing Persons Act. The statement before the Committee was as follows: "It has been administratively determined that pay and allowances to be credited during absence include all continuing pay and allowances to which entitled at beginning of absence but not temporary allowances such as per diem for travel expense. H. R. 4405 retains the present language and change is not deemed necessary

1. On the date of his capture plaintiff had been on detention at one place for more than 31 days and was only entitled to the allowances set forth in Table I.

(Page 2343, Vol. 6, Hearings, 78th Cong., H. Com. on Naval Affairs.)"

The Committee Report relied on by defendant states, with respect to Section 2: "(b) A person is entitled to receive or to have credited to his account the pay and allowances he was entitled to receive at the beginning of such period of absence or which he may become entitled to thereafter. Initially or subsequently included are credits for foreign duty and sea pay, submarine, aviation, and parachute pay, longevity, medal pay, uniform allowances, rental, subsistence and quarters allowances, increases incident to promotion and longevity, and other pay and allowances that may be authorized by law. Temporary or per diem allowances are not included." (Page 5, Rept. 1674, June 17, 1944.)

Defendant points out that when Congress knows the administrative construction of a law and fails to amend the law, it may be held to have affirmed the administrative construction, citing Brooks v. Dewar, 313 U.S. 354, 61 S.Ct. 979, 85 L.Ed. 1399. What precisely then, did Congress know of the administrative construction of Section 2 of the Missing Persons Act? From the legislative history set forth above, it is clear that Congress knew that "temporary allowances *such as per diem for travel expense*" were not considered by the agencies to be the sort of pay and allowances that should be credited to a captured soldier's account. Thus we may conclude that Congress may have intended specifically that per diem for travel expenses was an excluded allowance. What *other* temporary allowances had been administratively excluded, Congress was not told. However, the portion of the Committee report quoted above lists certain allowances that would be credited and yet to us appear to have a certain "temporary" flavor, such as flight-pay, rental allowance for officers where no quarters are supplied, and quarters and subsistence allowances for enlisted personnel where no quarters or rations in kind are furnished. From the record it appears that an officer receives a subsistence allowance as part of his regular pay, but a bachelor officer is only entitled to a rental allowance if no quarters can be furnished him. It also appears that the quarters and subsistence allowances specified in Table I of Circular 50 are payable only to enlisted men who are permanently assigned to a station where quarters or rations in kind are not furnished. Both these allowances and the rental allowance for bachelor officers may be credited to a man's account if he was in receipt of them on the date of his capture by the enemy. Yet both of these allowances terminate whenever the accommodations of which they are in lieu can be furnished by the Government. Although Congress was informed by the agencies concerned that it was their administrative practice to credit to a missing person's account only the "continuing pay and allowances" to which such person was entitled at the beginning of his absence, we feel that the actual administrative decisions under such practices as to what is a "continuing pay and allowance" are too inconsistent with the normal and usual interpretation of the term "continuing" for us to attribute to Congress a knowledge of the precise types of pay to be included or excluded in the absence of specific designation. The only specific designation alluded to in the hearings was per diem for travel expense. It is common knowledge that one's expenses during travel and for detentions of short duration in the course of travel are greater than they would be while not traveling. In recognition of this, the Government has provided for a travel allowance and for rations and quarters allowances during detentions in travel, which were in amounts in excess of those same allowances provided for men assigned to permanent duty but who were likewise not supplied with rations in kind. However, after the person in travel status, which may be regarded as temporary-duty status, had spent more than thirty-one days in one place, his quarters and rations allowance were reduced by the regulations to the exact amount received by the permanently assigned person for whom the Government was unable to supply such accommodations in kind. The plaintiff in this case had been on temporary duty on Wake Island for

more than thirty-one days when he was captured and had thus reverted to the actual pay status of a permanently assigned enlisted man not provided with rations and quarters in kind. If he had been permanently assigned to Wake Island and receiving subsistence at $1.20 and quarters at $1.15 per day, those allowances, we think, would have been credited without question to his account during his captivity. We find nothing in the Missing Persons Act, its legislative history, or in the administrative practices of the various services, to justify the refusal to credit such allowances to plaintiff's account during the period of his captivity. Had he been captured during the first thirty-one days of his duty on Wake Island while in receipt of allowances in excess of those received by permanently assigned personnel in otherwise similar circumstances with respect to rations and quarters, our decision might be different for the reasons indicated above, but it is not necessary for the court to pass on that issue in this case.

We conclude that there should have been credited to plaintiff's pay accounts during the period of his captivity from December 23, 1941, to August 15, 1945, the pay and allowances to which he was entitled at the beginning of his captivity and to which he became entitled thereafter, pursuant to Section 2 of the Missing Persons Act. Plaintiff is, therefore, entitled to the allowances for subsistence and quarters provided for in the applicable regulations set forth in our finding 7, and also to the increased allowances for subsistence and quarters provided for in subsequent Executive Orders, issued during plaintiff's captivity, as set forth in our finding 8. Judgment therefor will be entered in his favor. The entry of judgment, however, is suspended pending the filing of a computation by the General Accounting Office of the exact amount to which plaintiff is entitled in accordance with this decision.

It is so ordered.

JONES, Chief Judge, and HOWELL, MADDEN, and WHITAKER, Judges, concur.